[Cite as *Arnold v. Burger King*, 2015-Ohio-4485.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101465**

**SHANNON ARNOLD**

PLAINTIFF-APPELLEE

vs.

**BURGER KING, ET AL.**

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-14-823609

**BEFORE:** Laster Mays, J., E.A. Gallagher, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** October 29, 2015

**ATTORNEYS FOR APPELLANTS**

**For Carrols, L.L.C.**

Carl H. Gluek
Frantz Ward, L.L.P.
200 Public Square, Suite 3000
Cleveland, Ohio   44114

Jeffrey J. Mayer
Akerman L.L.P.
71 South Wacker Drive, 46th Floor
Chicago, Illinois 60606

Catherine A. Miller
Freeborn & Peters, L.L.P.
311 South Wacker Drive, Suite 300
Chicago, Illinois 60606

**ATTORNEYS FOR APPELLEE**

William Craig Bashein
Anthony N. Palombo
Bashein & Bashein Co., L.P.A.
Terminal Tower, 35th Floor
50 Public Square
Cleveland, Ohio   44113

Paul W. Flowers
Paul W. Flowers Co., L.P.A.
Terminal Tower, Suite 1910
50 Public Square
Cleveland, Ohio 44113

**For Terry Matthews**

Terry Matthews, pro se
4088 Dartford Road
South Euclid, Ohio 44121

ON RECONSIDERATION[1]

---

[1] The original announcement of decision in *Arnold v. Burger King,* 8th Dist. Cuyahoga No. 101465, 2015-Ohio-1639,

ANITA LASTER MAYS, J.:

## I.    FACTS AND PROCEDURE

{¶1} Defendant-appellant Carrols L.L.C. ("Carrols"), which owns and operates Burger King restaurant franchises, appeals from the trial court order that denied its motion to either compel arbitration and to dismiss the complaint or to stay the proceedings filed against it by plaintiff-appellee, its former entry-level employee, Shannon Arnold ("Arnold").

{¶2} Upon a review of the record, we disagree with Carrols' assertions. Consequently, the trial court order is affirmed, and this case is remanded for further proceedings consistent with this opinion.

{¶3}  This employment dispute arises from the alleged rape of Arnold by her supervisor in the men's bathroom at a Burger King restaurant during working hours.   She subsequently filed suit alleging the rape and that she was harassed and sexually abused by her supervisor over a period of time.

{¶4}  As a term of her employment, Arnold executed a mandatory arbitration agreement ("MAA"). The agreement provides that Arnold is to submit to JAMS, Inc. ("JAMS"), a national arbitration association, "any and all disputes, claims or controversies for monetary or equitable relief arising out of or relating to [Arnold's] employment" as well as "claims or controversies relating to events *outside the scope of your employment*."   (Emphasis added.)

{¶5} Arnold filed her complaint against Burger King, Carrols, and the individual, Terry Matthews ("Matthews"), on March 13, 2014.   She alleged that she had been employed by Burger King and Carrols from May 2012 until August 2012 and that Matthews had been her supervisor.

---

released April 30, 2015, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal.   *See App*.R.22(C).    *See also* S.Ct.Prac.R.701.

She further alleged that on July 21, 2012, as she "was cleaning the restrooms as part of her duties as an employee" of the defendants, Matthews followed her, grabbed her, "pushed her against the door, and forced her to give him oral sex." Arnold presented six (6) causes of action against the defendants collectively: (1) sexual harassment; (2) respondent superior/negligent retention; (3) emotional distress; (4) assault; (5) intentional tort; and (6) employment discrimination.

{¶6} In lieu of an answer, Carrols filed a motion to compel arbitration pursuant to the MAA. It argued that the Federal Arbitration Act ("FAA") governed the dispute because Carrols is engaged in interstate commerce. It also asserted that the Burger King restaurant where Arnold was raped is one of over 500 franchises owned and operated by Carrols entities, which operates in 13 different states with more than 17,000 employees. Carrols further argued that the plain language of the MAA dictates that Arnold's claims be resolved in arbitration.

{¶7} In Arnold's response, she conceded that she signed the MAA but argued she was unaware that she was agreeing to arbitrate with anyone other than Carrols Corporation ("Corporation"). She asserted that because Carrols was not a party to the MAA, Carrols could not enforce it. She further argued that her claims fell outside the scope of the MAA agreement and that the agreement was unenforceable because it is overly broad and unconscionable.

{¶8} The trial court denied the motion to compel arbitration without opinion. Carrols now appeals and raises two assignments of error.

II. ASSIGNMENTS OF ERROR

{¶9} In the first assignment of error, Carrols argues the trial court erred in denying its motion to stay pending arbitration because the parties had a valid agreement to arbitrate, and

Arnold's claims were within the scope of the MAA. In the second assignment of error, Carrols argues that the arbitration clause must be enforced because it is not unconscionable.[2]

{¶10}   We find that both asserted errors lack merit. We affirm.

III.   **STANDARD OF REVIEW**

{¶11}   The question of whether a party has agreed to submit an issue to arbitration is reviewed under a de novo standard. *Hedeen v. Autos Direct Online, Inc.*, 8th Dist. Cuyahoga No. 100582, 2014-Ohio-4200, ¶ 9, citing *McCaskey v. Sanford-Brown College*, 8th Dist. Cuyahoga No. 97261, 2012-Ohio-1543, ¶ 7; and *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12. Under a de novo standard of review, we give no deference to a trial court's decision. *Hedeen* at ¶ 9, citing *Brownlee v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 97707, 2012-Ohio-2212, ¶ 9; *Akron v. Frazier*, 142 Ohio App.3d 718, 721, 756 N.E.2d 1258 (9th Dist.2001).

IV.   **ANALYSIS**

{¶12}   Carrols argues that Arnold's claims are subject to arbitration under the MAA because they arise out of Arnold's employment. Arnold responds that Carrols cannot enforce the MAA against her because the corporate employer named party in the MAA is not Carrols but Burger King and that her claims did not fall under the scope of the MAA.

{¶13}   We find that Carrols is a proper party to the MAA; however, we also find merit in Arnold's assertion that her claims do not fall under the scope of the MAA. Therefore, we affirm the trial court's denial of Carrols' motion to compel arbitration.

A.      **Enforceability by Carrols as a Party to the Agreement**

---

[2]  Carrols failed to cite in the trial court, and fails to cite in its appellate brief, either R.C. 2711.02 or 2711.03 governing stays and enforcement of arbitration.

**{¶14}** Arnold's arbitration agreement provides, in plain language:

My agreement to arbitrate Claims extends to Claims against Carrols' officers, directors, managers, employees, owners, attorneys and *agents*, as well as to any dispute you have with *any entity owned, controlled or operated by Carrols Corporation*.

(Emphasis added.)

**{¶15}** Attached to Carrols' motion to compel arbitration was the affidavit of Gerald DiGenova ("DiGenova"), Vice President of the Human Resources Department of Carrols Restaurant Group, Inc., and copies of several documents. DiGenova explained the corporate relationship between Carrols Restaurant Group, Inc., Carrols L.L.C., and Burger King restaurants. He averred that Carrols adopted the MAA for all employees as of August 1, 2006, and that Arnold executed the MAA at the time she was hired as an employee.

**{¶16}** DiGenova verified the motion's attached documents that included (1) a copy of the MAA signed by Arnold on May 10, 2012; (2) information about JAMS, the alternative dispute resolution provider named in the MAA; and (3) a "complete copy" of the JAMS employment arbitration rules and procedures.[3]

**{¶17}** DiGenova's affidavit states that the Corporation is the sole member of Carrols. Therefore, although Carrols is not "a signatory" to the agreement, we agree that it may enforce the agreement as an owner or agent of the Corporation, unless there exists some common law justification to void the contract. *Javitch v. First Union Secs.*, 315 F.3d 619, 629 (6th Cir.2003).

**B.    Enforceability of the MAA**

   **1.    Scope of the Agreement (Assignment of Error I)**

---

[3] The JAMS rules and regulations were not attached to the MAA signed by Arnold but were supplied to the trial court in support of the motion to compel arbitration. The MAA refers the employee to the JAMS website at "jamsadr.com" or suggests the employee ask the location manager.   Also per the MAA, the arbitration is subject to whatever rules and regulation "then in effect," at the time of instituting the arbitration.

**{¶18}** Carrols relies on the United States Supreme Court's decision in *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. ____, 132 S.Ct. 1201, 1203, 182 L.Ed.2d 42 (2012), in support of its argument that the MAA should be enforced whenever Ohio law conflicts with the FAA.[4]

**{¶19}** In *Marmet*, family members brought personal injury and wrongful death claims against a Marmet nursing home in West Virginia. The West Virginia Supreme Court, faced with the question of enforceability based on a public policy violation, held that arbitration agreements that apply to personal injury and wrongful death claims against nursing homes are unenforceable under state law. The West Virginia court also concluded that the FAA did not pre-empt this state public policy.

**{¶20}** In reversing the West Virginia Supreme Court's decision, the U.S. Supreme Court, quoting the FAA, explained:

> The FAA provides that a "written provision in * * * a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Marmet* at 1203, quoting 9 U.S.C. 2. Based on this provision, the *Marmet* court held that "'[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA.'" *Id.*, quoting *AT&T Mobility v. Concepcion*, 563 U.S. _____, 131 S.Ct. 1740, 1747, 179 L.Ed.2d 742 (2011).

---

[4] We recognize that the FAA was created in 1925 to address business-to-business arbitration agreements involving equally sophisticated parties. The scope of the FAA has been expanded over the years to encompass, consumers, employees, nursing home residents, and civil rights actions. Grassroots and federal legislative efforts have been underway to address the rights of individuals subject to mandatory arbitration in noncommercial areas. *See, e.g.*, the Arbitration Fairness Act of 2015, S. 1133, 114th Cong. (2015); Arbitration Fairness Act of 2013, S. 878, 113th Cong. (2013); H.R. 1844, 113th Cong. (2013) (bills are identical). *See also*, Sen. Al Franken's (D-MN) amendment to H.R. 3326, the "Department of Defense Appropriations Act, 2010," which prohibits defense contractors from restricting their employees' abilities to take workplace discrimination, battery, and sexual assault cases to court versus arbitration. Pub. L. 111-118, §8116, 123 Stat. 2409, 19 Dec. 2009.

**{¶21}** Accordingly, the *Marmet* court concluded that "West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA." *Marmet*, 565 U.S. ____, 132 S.Ct. at 1204, 182 L.Ed.2d 42. However, *Marmet* is not determinative here.

**{¶22}** The *Marmet* court made the threshold finding that the plaintiffs' claims fell within the scope of the arbitration agreement, in contrast to the instant case. In addition, the court acknowledged that the West Virginia court also had to "consider whether, absent th[e] general policy, the arbitration clauses in [plaintiff's cases] are unenforceable under state common law principles that are not specific to arbitration and pre-empted by the FAA." *Id.* In other words, the West Virginia court was free to find the arbitration agreement unenforceable for common law reasons, such as invalid formation of the contract or unconscionability.

**{¶23}** Generally speaking, Ohio's public policy encourages arbitration as a method to settle disputes. *Schaefer v. Allstate Ins. Co.*, 63 Ohio St.3d 708, 711-712, 590 N.E.2d 1242 (1992); and the Ohio Arbitration Act, R.C. Chapter 2711 (a trial court, "shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement." R.C. 2711.02).

**{¶24}** As a result of Ohio's pro-arbitration stance, courts indulge a strong presumption in favor of arbitration when the disputed issue falls within the scope of the arbitration agreement. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 471, 700 N.E.2d 859 (1998)*; Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 27. Ohio also holds that arbitration agreements are, "'valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract.'" *Taylor Bldg.* at ¶ 33, quoting R.C. 2711.01(A); *Marmet*, 565 U.S. ____, 132 S.Ct. at 1204, 182 L.Ed.2d 42.

**{¶25}** Though guided by a strong presumption, Ohio also recognizes that principles of equity and fairness require that greater scrutiny be given to arbitration provisions that do not involve parties of equal sophistication and bargaining power:

> To be sure, an arbitration clause in a consumer contract with some characteristics of an adhesion contract "necessarily engenders more reservations than an arbitration clause in a different setting," such as a collective-bargaining agreement or a commercial contract between two businesses.

*Taylor Bldg., infra,* at ¶ 49, quoting *Williams* at 464.

**{¶26}** This court has embraced the need for increased scrutiny in such cases:

> This court has previously emphasized the need for scrutiny arising from the uneven field upon which the consumer and business operate. "An arbitration agreement should only be enforceable when it was freely entered into, and the circumstances should be scrutinized where a consumer is confronted with a sophisticated lending institution, and waives the constitutional right of trial. * * *" *Miller v. Household Realty Corp.*, 8th Dist. Cuyahoga No. 81968, 2003-Ohio-3359, ¶ 40; *Hampton v. Swad*, 10th Dist. Franklin No. 03AP-294, 2003-Ohio-6655, ¶ 10.

*Olah v. Ganley Chevrolet, Inc.*, 8th Dist. Cuyahoga No. 86132, 2006-Ohio-694, ¶ 13.

**{¶27}** The Ohio Supreme Court has steadfastly maintained that, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" *Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St.3d 411, 2011-Ohio-5262, 958 N.E.2d 1203, ¶ 20, quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648-649, 106 S.Ct. 1415, 89 L. Ed.2d 648 (1986). *See also Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, ¶ 11-14 (in order for an arbitration agreement to be enforceable, the agreement must apply to the disputed issue), and *Ghanem v. Am. Greetings Corp.*, 8th Dist. Cuyahoga No. 82316, 2003-Ohio-5935, ¶ 12.

**{¶28}** The *Taylor* court explained:

> Accordingly, when deciding motions to compel arbitration, the proper focus is whether the parties actually agreed to arbitrate the issue, i.e., the scope of the arbitration clause, not the general policies of the arbitration statutes. [*EEOC v.*] *Waffle House[, Inc.*], 534 U.S. [279] at 294[, 122 S.Ct. 754, 151 L.Ed.2d 755

(2002)]. It follows that although any ambiguities in the language of a contract containing an arbitration provision should be resolved in favor of arbitration, the courts must not "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *Id*.

*Taylor*, *infra*, at ¶ 20; *Marks v. Morgan Stanley Dean Witter Commer. Fin. Servs.*, 8th Dist. Cuyahoga No. 88948, 2008-Ohio-1820, ¶ 15 ("parties cannot be compelled to arbitrate a dispute in which they have not agreed to submit to arbitration").

{¶29} The Ohio Supreme Court stated that, in determining arbitrability, a court must be guided by the following analysis:

(1) "[A]rbitration is a matter of contract and a party cannot be required to so submit to arbitration any dispute which he has not agreed to so submit"; (2) that the question whether a particular claim is arbitrable is one of law for the court to decide; (3) that when deciding whether the parties have agreed to submit a particular claim to arbitration, a court may not rule on the potential merits of the underlying claim; and (4) that when a "contract contains an arbitration provision, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"" [*Academy of Medicine of Cincinnati v. Aetna Health, Inc.*], 155 Ohio App.3d 310, 2003-Ohio-6194, 800 N.E.2d 1185, P12, quoting *Cohen v. PaineWebber, Inc.*, Hamilton App. No. C-010312, 2002-Ohio-196, 2002 WL 63578, quoting *Council of Smaller Enterprises*, 80 Ohio St.3d at 665-666, 687 N.E.2d 1352, quoting *AT&T Technologies, Inc. v. Communications Workers of Am.* (1986), 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648.

*Academy of Medicine* at ¶ 5.

{¶30} Ohio courts are guided in this analysis by the federal standard set forth in *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386 (6th Cir. 2003), in determining whether a cause of action is within the scope of an arbitration agreement. "A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." *Academy of Medicine*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488 at ¶ 35 (adopting *Fazio* protocol for state court arbitrability analysis). *See also Complete Personnel Logistics, Inc. v. Patton*, 8th Dist. Cuyahoga No. 86857,

2006-Ohio-3356, ¶ 15 ("tort claims that may be asserted independently, without reference to the contract, fall outside the scope of the arbitration provision").

{¶31}   The *Academy of Medicine* court elaborated on the propriety of employing the *Fazio* test in light of the presumption of arbitrability in Ohio:

> The *Fazio* test does not act as a detriment to arbitration. It functions as a tool to determine a key question of arbitrability —   whether the parties agreed to arbitrate the question at issue. It prevents the absurdity of an arbitration clause barring a party to the agreement from litigating any matter against the other party, regardless of how unrelated to the subject of the agreement. *It allows courts to make determinations of arbitrability based upon the factual allegations in the complaint instead of on the legal theories presented. It also establishes that the existence of a contract between the parties does not mean that every dispute between the parties is arbitrable.*

(Emphasis added.) *Academy of Medicine* at ¶ 29.

{¶32}   *Academy of Medicine* agreed with *Fazio's* observation that, while torts may sometimes be covered by arbitration clauses where the allegations underlying the claims touch matters covered by the arbitration agreement, tort claims that may be asserted independently, without reference to the contract, fall outside of the scope of an arbitration provision. *Fazio* at ¶ 6. The court emphasized:

> "We are, however, aware of the Supreme Court's warning against 'forcing unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.'   *First Options [of Chicago, Inc. v. Kaplan* (1995)], 514 U.S. [938] at 945, [115 S. Ct. 1920, 131 L.Ed.2d 985]."   (Emphasis added.) *Fazio*[ ] at 395.

*Academy of Medicine, infra,* at ¶ 35.

{¶33}   The *Academy of Medicine* court *also* was also persuaded by the logic of the Tenth Circuit's determination of the scope of an arbitration provision in *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir.1995).   Coors and Molson had a licensing agreement to exclusively distribute Coors products in North America. Molson entered into a similar contract with Miller Brewing Company.   Coors sued Molson for antitrust violations.

**{¶34}** Finding that the claims were outside of the scope of a broadly drafted arbitration clause contained in the licensing agreement, the *Coors* court recognized:

> The existence of a contractual relationship between Coors and Molson did not mean that every conceivable claim between the two was arbitrable.
>
> * * *
>
> "A dispute within the scope of the contract is still a condition precedent to the involuntary arbitration of antitrust claims. * * * For example, if two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship."

*Academy of Medicine v. Aetna Health, Inc.*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488,

¶ 21-23, quoting *Coors* at 1516.

**{¶35}** The South Carolina Supreme Court considered arbitration of an intentional tort in

*Aiken v. World Fin. Corp.*, 373 S.C. 144, 644 S.E.2d 705 (2007). The question in *Aiken* was

whether a lender could require a consumer to be bound by an arbitration clause contained in the

loan documents where the consumer was damaged by the intentional tort of identity theft

conducted by the lender's employees:

> Both state and federal policy favor arbitration of disputes and unless a court can say with positive assurance that the arbitration clause is not susceptible to any interpretation that covers the dispute, arbitration should generally be ordered. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596-97, 553 S.E.2d 110, 118-19 (2001). However, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. *Id*. at 596, 553 S.E.2d at 118. Given these principles, courts generally hold that broadly-worded arbitration agreements apply to disputes in which a "significant relationship" exists between the asserted claims and the contract in which the arbitration clause is contained. *Id*. at 598, 553 S.E.2d at 119 (quoting *Long v. Silver*, 248 F.3d 309 (4th Cir.2001)).
>
> * * * Applying what amounts to a "but-for" causation standard essentially includes every dispute imaginable between the parties, which greatly oversimplifies the parties' agreement to arbitrate claims between them. Such a result is illogical and unconscionable. *See Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 638 (Fla. 1999)

* * *

*Because even the most broadly-worded arbitration agreements still have limits founded in general principles of contract law, this Court will refuse to interpret any arbitration agreement as applying to outrageous torts that are unforeseeable to a reasonable consumer in the context of normal business dealings.*

* * *

In establishing the line for claims subject to arbitration, this Court does not seek to exclude all intentional torts from the scope of arbitration. * * * We only seek to distinguish those *outrageous torts*, which although factually related to the performance of the contract, are legally distinct from the contractual relationship between the parties. *See McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189, 191 (S.D.N.Y. 1985).

Our decision today does not ignore the state and federal policies favoring arbitration as a less formal and more efficient means for resolving disputes. *See Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 396, 498 S.E.2d 898, 902 (Ct. App. 1998). This Court merely seeks, as a matter of public policy, to promote the procurement of arbitration in a commercially reasonable manner. *To interpret an arbitration agreement to apply to actions completely outside the expectations of the parties would be inconsistent with this goal.*

(Emphasis added and fns. omitted.) *Aiken* at 149-152. *See also Woda Constr., Inc. v. Miles-McClellan Constr. Co.*, Franklin C.P. Nos. 11CVH-04-4582 and 11CVH-04- 4584 (Consolidated) (Dec. 6, 2012), citing *Aiken* for the premise that a tort claim that is completely independent of a contract and may be maintained without reference to the contract is not arbitrable. Clearly, a lawsuit arising from a rape is an outrageous tort that is legally distinct from the contractual relationship between the parties.

{¶36} While there are a number of cases on the enforceability of arbitration agreements and clauses, particularly in the consumer and employment realm, there are distinctly fewer on claims involving coworker criminal violence such as sexual assault. There are, however, several cases that are instructive here.

{¶37} In *Smith v. Captain D's, LLC,* 963 So.2d 1116 (Miss.2007), the Mississippi Supreme Court found a similar broadly drafted provision unconscionable where the employee's

claims arose from a rape that was related to, but fell outside of the scope of, the employee's work. Smith was allegedly raped by her manager at the restaurant during working hours. The Mississippi Supreme Court held that an employee's sexual assault claim, as well as negligent hiring, retention, and supervision of her manager, did not fall within the scope of the arbitration agreement even though the agreement broadly covered "any and all * * * disputes, or controversies arising out of or relating to my employment."

**{¶38}** In reaching this conclusion, the court explained:

> "[W]hile there is a strong and 'liberal policy favoring arbitration agreements,' such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract."

*Id.* at 1119, quoting *Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir.1995), quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985). The Mississippi court concluded that, because the plaintiff's claims involved rape, they fell outside of the scope of employment even though the rape occurred at work during working hours. "[A] claim of sexual assault neither pertains to nor has a connection with [plaintiff]'s employment." *Id.* at 1121. *See also Niolet v. Rice*, 20 So.3d 31 (Miss.App.2009), holding employee's claims of sexual assault and battery against her supervisor were not directly or indirectly related to her employment.

**{¶39}** The widely publicized case of *Jones v. Halliburton*, 583 F.3d 228 (5th Cir.2009), involved a gang rape of a federal contractor's employee by coworkers. Jones's employment agreement included the provision of overseas housing. She was placed in barracks occupied predominantly by male employees and promptly requested new housing due to the sexual harassment. *Id.* at ¶ 231.

**{¶40}** The morning after a social event outside of the barracks area, an event that involved alcohol, Jones awakened to discover that she had been drugged, beaten, and gang raped by several coworkers. She suffered injuries including torn pectoral muscles. *Id*.

**{¶41}** Jones allegedly reported the rape to another coworker and stated that her employer mishandled the rape kit, placed her under armed guard in a container, and was not permitted to leave or contact her family until she convinced one of her guards to allow her to telephone her father. Jones also stated she met with her supervisor and human resource personnel and was given the option, "to stay and 'get over it'; or to return home without the 'guarantee' of a job on return." *Id.* at ¶ 232. Her father was able to obtain congressional assistance to secure her return to the United States. *Id*.

**{¶42}** The court considered whether the events arose out of the employment relationship and therefore were subject to arbitration. The Fifth Circuit held that Jones did not agree to arbitrate her claims for false imprisonment, assault and battery, negligent supervision, hiring and retention, and intentional infliction of emotional distress as the events did not arise within the scope of the relationship:

> Of course, although this reach [the language in the agreement] is broad, it is not unbounded. *Pennzoil* [*Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir.1998)] recognized that a dispute need only "'touch' matters covered by" the arbitration agreement to be arbitrable, *id.* at 1068 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)); in the same discussion, however, it defined an arbitrable dispute under a broad clause as one "having a significant relationship to the contract" — here, Jones' employment contract — "regardless

of the label attached to the dispute." *Pennzoil,* 139 F.3d at 1067. It further noted:

"[E]ven broad clauses have their limits." *Id*. at 1067 n.8.

*Jones*, 583 F.3d at 235. The court further stated that, "Jones' allegations do not 'touch matters' related to her employment, let alone have a 'significant relationship' to her employment contract." *Id.* at 241 (i.e., the *Fazio* test).

**{¶43}** The Eleventh Circuit entertained the question of whether a broadly drafted arbitration clause encompassed an employee being drugged and sexually assaulted by her cruise ship coworkers in *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir.2011). Doe's claims included a refusal by the cruise ship supervisors to allow her to seek medical attention when docked at ports.

**{¶44}** She filed five claims under the Jones Act, 46 U.S.C. § 30104 and Seaman's Wage Act, 46 U.S.C. § 10313 and five common law tort claims. Doe appealed the trial court's refusal to stay arbitration of the claims. *Doe* at 1211. The court reversed and remanded the common law tort claims and, construing a broadly drafted clause, held that the claims for false imprisonment, intentional infliction of emotional distress, invasion of privacy, spoliation of evidence, and fraudulent misrepresentation were not connected to, did not relate to, and did not arise out of her employment:

> The term "arising out of" is broad, but it is not all encompassing. In construing that same term to determine whether a dispute arises out of a contract, we have explained that the focus is on "whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia [v. Wholesale Telecom Corp.]*, 248 F.3d [1109] at 1116 [(11th Cir.2001)]; *see also Hemispherx Biopharma [v. Johannesburg Consol. Invs.]*, 553 F.3d 1351, 1367 ("We have previously focused on foreseeability as [the] proper standard for resolving the scope of an arbitration clause that covers disputes 'arising out of or pursuant to' the contract between the parties."). "Arising out of" requires the existence of some direct relationship between the dispute and the performance of duties specified by the contract. *See Telecom Italia*, 248 F.3d at 1116 ("Disputes that are not related — with at least some directness — to performance of duties

specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause.").

Similarly, "related to" marks a boundary by indicating some direct relationship; otherwise, the term would stretch to the horizon and beyond. As the Supreme Court has explained in the ERISA pre-emption context, "related to" is limiting language and "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," it would have no limiting purpose because "really, universally, relations stop nowhere." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 1677, 131 L. Ed. 2d 695 (1995) (quotation marks omitted). The same rationale applies here.

"Connected with" also connotes the necessity of some direct connection; if it did not, the term would be meaningless. *Cf. Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir.1996) (construing a patent claim and stating that "[i]f, as Ethicon argues, 'connected to' should be read broadly to include elements which are connected directly or indirectly, then * * * the 'connected to' limitation would be meaninglessly empty").

*Doe* at 1218-1219. The court held that the claims were not an immediately, foreseeable result of the employment and thus, were not within the scope of the clause. *Id*. at 1219.

**{¶45}** The "'overarching issue is whether the parties agreed to arbitrate the issue.'" *Academy of Medicine*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488 at ¶ 19 quoting *Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. 3346, 87 L.Ed.2d 444. Was it reasonably foreseeable that the arbitration contract encompassed the conduct in question? *See Fazio*, 340 F.3d 386 at ¶ 395.

**{¶46}** Foreseeability embraces the knowledge, sophistication and expectations of the parties at the time of contracting. This is not a case where an employee whose claims arose directly out of the employment relationship, was a professional with a negotiated contract of employment whose education, experience, and marketability provided an option to seek another position instead of accepting employment that required arbitration. *See, e.g.*, *Short v. Resource Title Agency, Inc*., 8th Dist. Cuyahoga No. 95839, 2011-Ohio-1577. Nor is this a case where a lower level employee appealed the arbitrability of an agreement where she testified that she simply

failed to read it. *See Butcher v. Bally Total Fitness Corp.*, 8th Dist. Cuyahoga No. 81593, 2003-Ohio-1734, ¶ 41 ("The crux of appellant's appeal here centers around the unavoidable fact of 'the naked truth that she did not read the contract. It drives a stake into the heart of her claim.* * *' *ABM Farms [v. Woods,* 81 Ohio St.3d 498, 692 N.E.2d 574 (1998).]")

{¶47} Further to the question of foreseeability and expectations, Carrols possessed unique and superior knowledge of the employment environment at the time the MAA was executed. In 1998, the *EEOC* filed suit in the Northern District of New York against Carrols on behalf of a class of 511 female employees, including teenaged employees, who were allegedly subjected to discrimination involving, "(1) hostile work environment sexual harassment; (2) failure to remedy alleged instances of sexual harassment; (3) retaliation against employees who complained about sexual harassment; and (4) constructive discharge of employees by failing to remedy a hostile work environment." *EEOC v. Carrols Corp.*, N.D.New York No. 5:98-CV-1772 (FJS/GHL), 2011 U.S. Dist. LEXIS 20972, *2-3 (Mar. 2, 2011).

{¶48} In 2005, the year prior to the launch of the Carrols mandatory arbitration program, the court dismissed the pattern and practice charges under 42 U.S.C. § 2000e-6 (§ 707 of Title VII). *EEOC v. Carrols Corp.*, N.D.New York No. 5:98-CV-1772 (FJS/GHL), 2005 U.S. Dist. LEXIS 8337 (Apr. 20, 2005).

{¶49} In 2011, Carrols filed for summary judgment on the remaining charge brought in the name of the EEOC on behalf of the individual female employees (42 U.S.C. § 2000e-5(f)(1) (§ 706 of Title VII)). *Carrols Corp.*, 2011 U.S. Dist. LEXIS 20972, *2.

{¶50} Carrols sought dismissal on various grounds:

"Untimely: Did not file charge and unrelated to timely charge," "Untimely: Failure to exercise right to sue," "Untimely: alleged [sexual harassment and/or retaliation] occurred prior to May 29, 1997," "Not supported by admissible

evidence," "Non-actionable sexual harassment," "Non-actionable retaliation," "Bound by prior determination of charge/claim," and "EEOC failed to exercise discretion [with regard to] charge."

*Id.* at *13-14.

**{¶51}** The court summarized the factual grounds underlying the EEOC's charges:

Although the conduct differs in type and severity, running the gambit from repeatedly standing uncomfortably close to, rubbing up against, and offensively touching the bodies of these individuals to incidents of serious physical assault and rape, in addition to a constant barrage of sexually charged and offensive comments that were on-going * * *.

*Id*. at *33.

**{¶52}** The court found that a number of claims failed due to procedural reasons such as employees who, "failed to avail themselves of the opportunity to seek Plaintiff's review of the state agency's decision or failed to file a suit within ninety days of receiving a right-to-sue letter from Plaintiff." *Id*. at *15. Another individual filed a civil suit and settled with a general release of claims. *Id.* at *16. An additional group was dismissed due to staleness because the acts occurred before May 29, 1997. *Id.*

**{¶53}** A number of complainants were dismissed for failure to support the claims with admissible evidence, "the only material in the record that supports their claims is an unsigned and/or undated summary of what their testimony would be regarding the alleged harassment that they suffered." *Id*. at *19. The court dismissed the claims of another group, finding that the claims failed as a matter of law to establish a claim of hostile work environment/sexual harassment. *Id.* at *25.

**{¶54}** Finally, the court held that the remaining 89 parties could proceed with the suit due to issues of fact precluding summary judgment for hostile work environment/sexual harassment. Three of the 89 moved forward because Carrols did not challenge their claims. *Id.* at *28.

**{¶55}** In 2013, the parties entered into a settlement Consent Decree,[5] which included payment of $2.5 million to the remaining 89 and requiring Carrols to take a number of steps to address the issue including increasing employees' awareness of Carrols' anti-harassment policies, responding to related complaints, providing enhanced training for managers, posting notices and issuance of an injunction against further retaliation and harassment. *See* Consent Decree, *infra*, generally; Equal Employment Opportunity Commission Press Release, *Carrols Corp. To Pay $2.5 Million to Settle EEOC Sexual Harassment and Retaliation Lawsuit*, issued January 9, 2013, http://www.eeoc.gov/eeoc/newsroom/release/1-9-13.cfm.

**{¶56}** The lawsuit had been pending for more than ten (10) years at the time Arnold executed the MAA. Carrols was on notice of the allegations of sexual assault, including rape accusations, involving coworkers and restaurant supervisors in multiple restaurant locations at that time and had a unique knowledge of the environment and special challenges that may have been involved. Arnold did not have that knowledge.

**{¶57}** Ambiguity of the agreement is an additional factor that impedes foreseeability:

> While ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated. "Arbitration under the [FAA] is a matter of consent, not coercion."

(Citations omitted.) *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754 (2002), quoting *Volt Information Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract, or if the terms are reasonably susceptible to more than

---

[5] *EEOC v. Carrols Corp.*, N.D.New York No. 98-CV-01772 (FWS/TWD) (Jan. 10, 2013).

one interpretation. *Willard Constr. Co. v. Olmsted Falls*, 8th Dist. Cuyahoga No. 81551, 2003-Ohio-3018, ¶ 17.

{¶58} Carrol's argues the MAA only applies to claims arising out of the scope of employment, but that is not how Carrols defined "Claims" in the MAA. Ambiguities are generally construed against the drafter where the parties have unequal bargaining power to select the contract language. *Michael A. Gerard, Inc. v. Haffke*, 8th Dist. Cuyahoga No. 98488, 2013-Ohio-168, ¶ 14. This is particularly true where, as here, Carrols effectively acknowledges the ambiguity by arguing that the MAA language does not actually mean what it says, i.e., that it also covers acts outside of the scope of the agreement.

{¶59} Additionally relevant to assessing foreseeability and expectations is whether there was an understanding of what the parties understood the MAA language to mean. The MAA provides a list of legal causes of actions and laws, in legal terminology, such as strict liability, Family Medical Leave Act, and Employee Retirement Income Security Act.

{¶60} The MAA's sole listed exceptions to coverage are the "exclusive remedies under either workers compensation law or employee injury benefit plan." The MAA includes arbitration of "personal or emotional injury to you or your family." The agreement does not, in any way, explain the tremendously overreaching impact of its terms on the employee's life both within and outside the scope of employment. There is no bold language such as is required in consumer agreements putting the employee on notice of the extensive abrogation of rights.[6]

---

[6] In direct conflict with the MAA's definition of Claims, the Policy Notice ("Policy Notice") posted in the restaurant location states, "employment related disputes that cannot be resolved internally will proceed to arbitration rather than in a lawsuit." It does not say that disputes arising outside the scope of employment are also required to proceed to arbitration. An agreement to arbitrate claims that arise outside the scope of employment results in an infinite and unforeseeable variety of potential claims.

**{¶61}** The JAMS provisions are not attached to the MAA but are incorporated by reference to the website. Carrols did, however, provide a copy of the rather detailed 2009 terms and conditions to its motion to compel arbitration in the trial court.[7] The documents contain rules and regulations governing subject areas such as ex parte communications, e-filing, summary dispositions, rules of evidence, privilege and work product. It is also observed that the JAMS rules that will apply are the "then current" rules that are subject to change at any time. There is no indication that there would be further notice to the employee accompanied by a choice of opting out at that point.

**{¶62}** We proceed to apply the foregoing analysis to the instant case. Arnold's causes of actions are for: (1) sexual harassment; (2) respondeat superior/negligent retention; (3) emotional distress; (4) assault; (5) intentional tort; and (6) employment discrimination. Per *Academy of Medicine,* 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, we examine the factual allegations underlying Arnold's claim, and not the causes of action, to determine whether arbitration of the claims may be independently maintained without reference to the contract or relationship at issue, bringing them outside of the scope of arbitration. *Academy of Medicine* at ¶ 35. Secondly, we determine whether the acts complained of were a foreseeable result of Arnold's employment. *Doe*, 657 F.3d at 1218-1219.

**{¶63}** The complaint states that Arnold was constantly subjected to ongoing verbal and unwanted physical conduct that culminated in rape. On July 21, 2012, Arnold was cleaning the men's restroom when Matthews entered, grabbed Arnold by her hair, pushed her against the door and forced her to give him oral sex. She has incurred and believes she will continue to incur

---

[7] It is not determinable from the submission whether the JAMS information constituted the entirety of the requirements.

treatment for her medical and psychological injuries. The complaint also states that Carrols had actual or constructive knowledge of Matthews' tendencies and that he posed a hazard.

{¶64} The complaint further provides that Carrols and supervisor Matthews retaliated or threatened to retaliate against Arnold, including termination, due to her attempt to enforce her rights; that she suffered unrelenting abuse, torment, harassment, threats, and embarrassment; and that she will require medical care and psychiatric counseling. It is also asserted that Carrols aided, abetted, incited, compelled, and coerced others to engage in unlawful discriminatory practices and/or interfere with or to obstruct Arnold.

{¶65} Based on the underlying facts, we find that Arnold's claims relating to and arising from the sexual assault exist independent of the employment relationship as they may be "maintained without reference to the contract or relationship at issue." *Academy of Medicine*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, at ¶ 24; *Fazio*, 340 F.3d 386, at ¶ 395, and *Winters Law Firm. L.L.C. v. Groedel*, 8th Dist. Cuyahoga No. 99922, 2013-Ohio-5260, ¶ 14. Any individual could assert the same causes of action based on the underlying facts.

{¶66} A patron may, for example based on the asserted facts, pursue an action for sexual harassment per the Ohio Civil Rights Act that prohibits discriminatory practices by a proprietor, employer, keeper, or manager of a place of public accommodation (R.C. 4112.02(G)) that includes a restaurant. R.C. 4112.02(A)(9). In addition, R.C. 4112.02(I) prohibits unlawful discrimination for opposing unlawful discriminatory practices.

{¶67} The second step of our scope of agreement analysis is to inquire whether the claims are a forseeable result of the employment. *Doe*, 657 F.3d at 1218-1219. We find that ongoing verbal and physical contact culminating in sexual assault as well as retaliation, harassment, or other detrimental acts against Arnold based on the unlawful conduct is not a foreseeable result of the employment.

### 2. Unconscionability (Assignment of Error II)

**{¶68}** Carrols asserts in its second assignment of error that the MAA is enforceable and is not unconscionable. We disagree.

**{¶69}** Unconscionability embodies two separate concepts: (1) unfair and unreasonable contract terms, i.e., substantive unconscionability; and (2) an absence of meaningful choice on the part of one of the parties, i.e., procedural unconscionability. *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 34. A party asserting the unconscionabilty of a contract must prove a quantum of both substantive and procedural unconscionability. *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, ¶ 30; *Taylor Bldg.* at ¶ 34. In other words, these two concepts create a two-prong conjunctive test for unconscionability. *Gates v. Ohio Sav. Assn.*, 11th Dist. Geauga No. 2009-G-2881, 2009-Ohio-6230, ¶ 47; *Strack v. Pelton*, 70 Ohio St.3d 172, 637 N.E.2d 914 (1994).

**{¶70}** An unconscionable agreement has been described by the United States Supreme Court:

> [A]s one "'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Thonen v. McNeil-Akron, Inc.*, 661 F.Supp. 1252 (N.D.Ohio 1986), quoting *Hume v. United States*, 132 U.S. 406, 411, 10 S. Ct. 134, 33 L. Ed. 393 (1889).

*Devito v. Autos Direct Online, Inc.*, 8th Dist. Cuyahoga No. 100831, 2015-Ohio-3336, ¶ 14.

### 1. Procedural Unconscionability

**{¶71}** In determining whether an agreement is procedurally unconscionable, courts consider the relative bargaining positions of the parties including each party's age, education, intelligence, experience, and who drafted the contract. *Taylor Bldg.* at ¶ 44. *See also Johnson v. Mobile Oil Corp.*, 415 F. Supp. 264 (E.D.Michigan 1976); *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 383, 613 N.E.2d 183 (1993). "Procedural unconscionability concerns the

formation of the agreement and occurs when no *voluntary* meeting of the minds is possible." (Emphasis added.) *Bayes v. Merle's Metro Builders/Blvd. Constr.*, 11th Dist. Lake No. 2007-L-067, 2007-Ohio-7125, ¶ 11.

**{¶72}** An important consideration is, "whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print?'" *Blackburn v. Ronald Kluchin Architects, Inc.*, 8th Dist. Cuyahoga No. 89203, 2007-Ohio-6647, ¶ 29, quoting *Vanyo v. Clear Channel Worldwide*, 156 Ohio App.3d 706, 2004-Ohio-1793, 808 N.E.2d 482, ¶ 18 (8th Dist.). "[A] determination of unconscionability is a fact-sensitive question that requires a case-by-case review of the surrounding circumstances." *Brunke v. Ohio State Home Servs.*, Inc., 9th Dist. Lorain No. 08CA009320, 2008 Ohio 5394, ¶ 8. *Wallace v. Ganley Auto Group.*, 8th Dist. Cuyahoga No. 95081, 2011-Ohio-2909, ¶ 44.

**{¶73}** As the Ohio Supreme Court explained:

> Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' "'age, education, intelligence, business acumen and experience, * * * who drafted the contract, * * * whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question.'" *Collins* [*v. Click Camera & Video*], 86 Ohio App.3d [826,] 834, 621 N.E.2d 1294 [(2d Dist.1993)]. "Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors." Restatement of the Law 2d, Contracts (1981), Section 208, Comment d.

*Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 43.

**{¶74}** It is clear that there was a disparity in bargaining power between Carrols and Arnold. Carrols wrote the MAA as well as the Policy Notice poster regarding the MAA that was

posted at the Burger King location. Arnold was an individual seeking an entry level "team member" position.

{¶75} Further, as we discussed in detail under the scope of the agreement analysis herein, Carrols possessed unique and superior knowledge of the employment environment at the time the MAA was executed. *See Taylor Bldg., infra* at ¶ 43. In *EEOC v. Carrols, infra*, involving sexual harassment charges, including sexual assault allegations, filed by the EEOC in 1998 and which were ongoing for more than a decade.

{¶76} Courts will also consider, on the issue of procedural unconscionability, "whether alterations in the printed terms were possible," *Hayes*, 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, at ¶ 23, and whether the parties had alternatives to entering into the contract. *Rupert v. Macy's Inc.*, N.D. Ohio No. 1:09CV2763, 2010 U.S. Dist. LEXIS 54050 (June 2, 2010).

{¶77} Arnold applied for employment in May 2012 and signed the MAA at the time she was hired.[8] The MAA is dated May 12, 2012. Carrols drafted the MAA and presented it to Arnold as a condition for hiring her at a Burger King restaurant. As for Arnold's bargaining power, the choice was either sign it or remain unemployed. There is no evidence that Arnold could alter any of its terms.

{¶78} Prior to moving forward with our analysis and as a point of clarification, we address a line of cases[9] that have been erroneously advanced for the per se premise that signing an arbitration agreement instead of seeking other employment (or resigning from employment),

---

[8]Affidavit of Raymond Lynn, Human Resource Manager of Carrol's Region One including the Cleveland and Akron, Ohio area.

[9] *See, e.g., Short v. Res. Title Agency, Inc.*, 8th Dist. Cuyahoga No. 95839, 2011-Ohio-1577; *Butcher*, 8th Dist. Cuyahoga No. 81593, 2003-Ohio-1734; *Post v. ProCare Auto. Serv. Solutions*, 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106; *Melia v. OfficeMax N. Am., Inc.*, 8th Dist. Cuyahoga No. 87249, 2006-Ohio-4765*; Vanyo*, 156 Ohio App.3d 706, 2004-Ohio-1793, 808 N.E.2d 482; *Bell v. Hollywood Entertainment Corp.*, 8th Dist. Cuyahoga No. 87210, 2006-Ohio-3974.

negates any possibility of procedural unconscionability. Such an interpretation is a misconstruction of the case law.

{¶79} First of all, such a broad interpretation provides an absurb result as no signed agreement could ever be procedurally unconscionable. In addition, this court has recently restated the obvious which is that no single factor alone determines whether a contract is procedurally unconscionable; a court must consider the totality of the circumstances. *Murea v. Pulte Group, Inc.*, 8th Dist. Cuyahoga No. 100127, 2014-Ohio-398, citing *Hayes*, 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, at ¶ 29-30; *Rude v. NUCO Edn. Corp.*, 9th Dist. Summit No. 25549, 2011-Ohio-6789.

{¶80} The great disparity in bargaining power, by itself, would not be sufficient to rescind the MAA. Carrols drafted the misleading MAA and the Policy Notice that would give an ordinary reasonable person a false sense of security. Comprehension of the terms of the agreement is an element of both procedural and substantive unconscionability, the latter of which is addressed in greater detail below.

{¶81} There can be no true meeting of the minds when a party is unable to understand the agreement. We restate that the MAA not only defines "Claims" as events arising out of the employment as well as outside of the scope of employment, it provides a laundry list of legal causes of actions and laws, in legal terminology, such as strict liability, Family Medical Leave Act, and Employee Retirement Income Security Act. The exceptions to coverage are the "exclusive remedies under either workers compensation law or employee injury benefit plan." The MAA includes arbitration of "personal or emotional injury to you or your family." The agreement does not, in any way, explain the tremendously overreaching impact of its terms on the employee's life both within and outside the scope of employment.

**{¶82}** The Policy Notice is also misleading because it contradicts the terms of the MAA. The Policy Notice states, "employment related disputes that cannot be resolved internally will proceed to arbitration rather than in a lawsuit." The Policy Notice does not say that disputes arising outside the scope of employment are also required to proceed to arbitration. One may be willing to arbitrate disputes that arise in the course of employment. It is an entirely different scenario when one agrees to arbitrate claims that arise outside the scope of employment because the variety of potential claims is practically infinite and unforeseeable.

**{¶83}** Based on the totality of the factors numerated herein, we find that the agreement is procedurally unconscionable. We next consider the second facet of the analysis, substantive unconscionability.

### 2. Substantive Unconscionability

**{¶84}** The MAA's terms were not only procedurally unconscionable but also substantively unconscionable. As stated herein under our procedural unconscionability analysis, inasmuch as the MAA sought to include every possible situation that might arise in an employee's life, the clause is substantively unconscionable as the arbitrator would be resolving disputes unrelated to employment. *See, e.g.*, *Drake v. Barclay's Bank Del. Inc.*, 8th Dist. Cuyahoga No. 96451, 2011-Ohio-5275.

**{¶85}** The Policy Notice states that arbitration is "quicker and less expensive for both sides." That is not always the case, particularly for the employee. For example, employment attorneys typically represent plaintiffs on a contingency basis so there is often no cost to the employee until success or settlement. Court filing fees are usually lower than the fees to initiate arbitration. Arbitration is generally beneficial for employers because it is, as opposed to litigation, less expensive due to brevity and lack of appeal rights. It is also advantageous to the employer where, as in this case, the agreement limits the worker's recovery of damages otherwise

available via litigation, "[i]n the event you prevail, [the arbitrator] will limit your relief to compensation for demonstrated and actual injury to the extent consistent with the Procedural Standards [that are not attached to the MAA]."

{¶86} To file a request for arbitration, an employee must send the request to the listed JAMS New York City office with a copy to the Legal Department in Syracuse, New York address with an explanation of the issue. The request must be sent via "U.S. mail or a reputable overnight delivery service." There is no mention of registered or certified mail to verify timeliness.

{¶87} The MAA also states, reassuring the employee of the minimal cost and promoting the cooperative effort, that "Carrols will reimburse you 50% of any JAMS filing fee, *if* within two weeks after your request for arbitration, proof of payment is delivered to and received by Carrols at the above address." (Emphasis added.) What constitutes proof of payment is not described. There is no statement of the cost of arbitration.

{¶88} If the employee submits the documents properly along with the unidentified fee amount, and if Carrols actually receives "proof of payment" (acceptable proof is not defined) within two weeks after the request for arbitration (the agreement does not state when the two weeks begins), Carrols will reimburse the employee for 50% of the unstated filing fee amount. The employee also bears any other costs, none of which are in the agreement. If the employee is able to determine the cost and initiate an arbitration, she must also craft an effective complaint and set forth arguments, unless she can afford to hire an attorney.

{¶89} Ohio cases have considered whether the prohibitive costs of initiating arbitration constitute a deterrent to obtaining arbitration relief. In *Taylor Bldg., infra*, the Ohio Supreme Court stated that there is a point at which the costs of arbitration could render a clause unconscionable as a matter of law. *Taylor Bldg.* at ¶ 60.

**{¶90}** This court, as well as the court in *Rude v. NUCO Edn. Corp.*, 9th Dist. Summit No. 25549, 2011-Ohio-6789*, infra*, concurs:

> Although silence of an arbitration clause with respect to costs does not, by itself, make the clause unconscionable, "if the costs associated with the arbitration effectively deny a claimant the right to a hearing or an adequate remedy in an efficient and cost-effective manner," then the clause is invalid.

*Rude* at ¶ 24, quoting *Felix v. Ganley Chevrolet Inc*., 8th Dist. No. 86990, 86991, 2006-Ohio-4500, ¶ 21.

**{¶91}** In *U.S. Bank N.A. v. Wilkens*, 8th Dist. Cuyahoga No. 96617, 2012-Ohio-1038, we considered the unconscionability of arguably prohibitive costs to which a consumer might be subjected to pursue arbitration. We were guided by the Ohio Supreme Court in *Williams*, 83 Ohio St.3d 464, 1998-Ohio- 294, 700 N.E.2d 859, where the court considered the unconscionability of arbitration for small consumer loans:

> "'The likely effect of these procedures is to deny a borrower against whom a claim has been brought any opportunity to a hearing, much less a hearing held where the contract was signed, unless the borrower has considerable legal expertise or the money to hire a lawyer and/or prepay substantial hearing fees. * * * In a dispute over a loan of $2,000 it would scarcely make sense to spend a minimum of $850 just to obtain a participatory hearing.' [*Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 1998 Ohio 294, 700 N.E.2d 859], quoting *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563 (1993)."

*U.S. Bank* at ¶ 36.

**{¶92}** The MAA refers the employee to the JAMS website, provides a generic link, and incorporates the terms and conditions by reference. This court observes that, instead of referring the trial court to the JAMS website to navigate its way through the information and determine the terms and conditions underlying the agreement since employment arbitration is just a portion of JAMS's services, Carrols provided the court with copies of the information. Glaringly absent from the submission, however, was a schedule of fees reflecting the cost to file as well as to maintain an action.

**{¶93}** Since

> [t]he arbitration agreement does not set forth applicable rules or costs of arbitration but simply refers the consumer to the rules of the American Arbitration Association ("AAA")[,] [w]e therefore find it necessary to delve deeply into the voluminous rules and procedure to discern the resultant costs governing the instant consumer dispute.

*Devito*, 8th Dist. Cuyahoga No. 100831, 2015-Ohio-3336, at ¶ 22.

**{¶94}** An examination of the JAMS website, which again is incorporated by reference into the MAA, reveals a wealth of information about JAMS which includes that JAMS is involved with a variety of practice areas and lists 45. The arbitration link directs the reader to the types of arbitration services JAMS provides in various disciplines, including consumer, expedited, and international.

**{¶95}** There is a true labyrinth of information with links to rules, forms, ethics, discovery protocols, etc. There is nothing to direct an arguably unsophisticated individual through the maze of information in order to ascertain which of the multiple documents apply to pursuing arbitration against Carrols.

**{¶96}** The MAA provides that an employee is to send a complaint to JAMS with a copy to Carrols' legal department. The JAMS website contains a six page form entitled "Demand for Arbitration" that was last updated "11/24/14." It is unknown whether a similar form was required to be filed to initiate arbitration via the MAA. To fill out the form, a party must know whether they are pursuing arbitration on a predispute, post dispute, oral dispute, or court order. A $400 nonrefundable "Case Management Fee" is also required. There is no schedule of fees contained in the document, just as there was none provided to the trial court via Carrols' submission of the applicable rules and regulations. In fact, this court's attempt to ascertain the costs attendant to pursuit of arbitration applicable to this case was an exercise in futility.

**{¶97}** The MAA provides that an aggrieved employee will be subject to the "then current" JAMS terms and conditions. Therefore, the employee (even if they possessed the level of sophistication required to navigate the JAMS website), would not, at the time of signing, be able to identify the applicable rules and regulations or know what terms and conditions applied if an arbitration was filed since the rules could be revised at any time without notice.[10]

**{¶98}** In *Post*, 8th Dist. No. Cuyahoga 87646, 2007-Ohio-2106, this court found a provision unconscionable that resulted in a stated advantage to the employer:

> The imbalance of the respective rights of the parties to the employment agreement demonstrates the unconscionability of the arbitration clause. While [the employee] is limited to mandatory arbitration regarding any employment dispute, the agreement provides that [the employer] may bypass arbitration and seek judicial remedies in court in order to obtain injunctive relief for any breach or threatened breach by [the employee] of the covenants contained in the non-competition and confidentiality provisions of the employment agreement. We are not persuaded by [the employer's] assertion that this provision, which allows [the employer] to use a judicial forum when it is the plaintiff, but limits [the employee] to arbitration when he is the plaintiff, is not unconscionable.

*Id*. at ¶ 17.

**{¶99}** The MAA provides that the "parties reserve the right to go to court if they are faced with the risk of irreparable harm, such as the disclosure of confidential information." Since the MAA attempts to cover "Claims" relating to almost every cause of action available to Arnold, the attempt at mutuality is misleading and arguably illusory. To the extent some degree of mutuality is deemed to be present, Arnold may be "irreparably harmed" if she is forced to defend herself at arbitration on a sensitive and emotionally scarring subject involving explicit personal details.

---

[10] This may also be considered an element of procedural unconscionability as it involves the acquiescence to future, unknown, and uncontrollable terms, subject to change without notice at any time.

**{¶100}** The MAA states that, "[t]he arbitrator will strictly apply relevant law and, in the event you prevail, will limit your relief to compensation for demonstrated and actual injury to the extent consistent with the Procedural Standards." There is no mention of attorney fees.

**{¶101}** The JAMS documents delivered to the trial court by Carrols, the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness effective July 15, 2009 ("Procedural Standards") provide:

> All remedies that would be available under the applicable law in a court proceeding, including attorneys fees and exemplary damages, as well as statutes of limitations, must remain available in the arbitration. Post-arbitration remedies, if any, must remain available to an employee.
>
> Comment: This standard does not make any change in the remedies available. Its purpose is to ensure that the remedies available in arbitrations and court proceedings are the same. *JAMS does not object if an employer chooses to limit its own post-arbitration remedies.*

(Emphasis added).

**{¶102}** The MAA says compensation is limited to "demonstrated and actual injury to the extent consistent with the Procedural Standards." The 2009 standards say that all remedies, including exemplary damages, are available. This language is ambiguous. Are remedies fully available to the employee or are they limited by the MAA? Ambiguities are generally construed against the drafter where the parties have unequal bargaining power to select the contract language. *Michael A. Gerard, Inc.*, 8th Dist. Cuyahoga No. 98488, 2013-Ohio-168, at ¶ 14.

**{¶103}** It is also observed that there is no choice of law provision or waiver clause in the MAA and, as to forum, the location "will be convenient to the employee." There is also no severability provision declaring that, if any portion of the contract is declared to be invalid, the remainder may still be enforced.

**{¶104}** We find that the MAA is also substantively unconscionable.

**V. Conclusion**

**{¶105}** This court finds that Arnold's claims are not only outside of the scope of the MAA but that the MAA is unconscionable as applied to this case.

**{¶106}** The trial court appropriately denied Carrols' motion to either compel arbitration and dismiss the case or stay litigation pending arbitration. Carrols' assignments of error are overruled.

**{¶107}** The trial court's order is affirmed, and this case is remanded for further proceedings consistent with this opinion.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;
EILEEN T. GALLAGHER, J., CONCURRING
IN PART AND DISSENTING IN PART WITH
SEPARATE OPINION

EILEEN T. GALLAGHER, J., DISSENTING:

**{¶108}** I respectfully concur in part and dissent in part. I agree that some of Arnold's claims were not foreseeable and do not fall within the scope of the arbitration agreement.

However, I would find the other claims, which arise directly from the employer-employee relationship, are governed by the agreement and must be resolved in arbitration.

{¶109} The parties arbitration agreement provides, in relevant part:

> Under this arbitration program, which is mandatory, Carrols and you agree that any and all disputes, claims or controversies for monetary or equitable relief arising out of or relating to your employment, even disputes, claims, or controversies relating to events occurring outside the scope of your employment ("Claims"), shall be arbitrated before JAMS, a nation arbitration association.

This language is considered "'the paradigm of a broad clause,'" because it purports to cover any and all disputes between the parties. *Academy of Medicine v. Aetna Health, Inc.*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, ¶ 18. Yet, despite their broad language, such clauses are not all-encompassing. *Id.* at ¶ 29.

{¶110} In *Academy of Medicine*, the Ohio Supreme Court adopted the method for determining the scope of an arbitration agreement articulated in *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386 (6th Cir.2003). *Academy of Medicine* at ¶ 24. *Fazio* held that "[a] proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." *Fazio* at 395. Later in that paragraph, *Fazio* continued: "Even real torts can be covered by arbitration clauses '[i]f the allegations underlying the claims "touch matters" covered by the [agreement].'" (Brackets sic.) *Id.*, quoting *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir.1987).

{¶111} Arnold's complaint asserts the following six causes of action against Burger King, Carrols, and Matthews (1) sexual harassment, (2) negligent hiring and retention, (3) retaliation, (4) intentional infliction of emotional distress, (5) intentional tort, and (6) sexual assault. Arnold's intentional tort claim reiterates the allegations of her sexual assault claim, but assigns blame to Burger King.

**{¶112}** Arnold's sexual harassment, retaliation, and negligent hiring and retention claims cannot be resolved without reference to the parties' employment relationship because these claims arise directly out of that relationship. In her complaint, Arnold alleges she was subjected to sexual harassment and a hostile work environment while she was engaged in the course and scope of her employment. Arnold's negligent hiring and retention claim only exists because of Burger King and Carrols' decision to hire Matthews as an employee of the company. Obviously Arnold's discrimination claim, which she brought pursuant to R.C. 4112.02, alleges that Carrols and Burger King engaged in discriminatory employment practices. These claims "touch matters" related to the parties' relationship and therefore fall within the scope of the arbitration provision.

**{¶113}** However, Arnold's sexual assault, intentional infliction of emotional distress, and intentional tort claims are beyond the scope of the arbitration agreement. We have held that "tort claims that may be asserted independently, without reference to the contract, fall outside the scope of the arbitration provision." *Complete Personnel Logistics, Inc. v. Patton*, 8th Dist. Cuyahoga No. 86857, 2006-Ohio-3356, ¶ 15. The only connection between Arnold's intentional tort claims and her employment is that they were committed by a co-worker. Yet, Matthew's actions were independent of the employment relationship and were therefore not a foreseeable result of Arnold's employment when she signed the MAA.

**{¶114}** *Fazio* reminds us of the Supreme Court's warning against "'forcing unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Fazio*, 340 F.3d at 395. Thus, in determining whether the plaintiff's tort claims fell within the scope of a broadly worded agreement, the focus is on whether the torts were the "'an immediate, foreseeable result of the performance of contractual duties.'" *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir.2011), quoting *Telecom Italia, SPA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir.2001).

{¶115} "Disputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause." *Telecom Italia* at 116. Therefore, the mere fact that Arnold's intentional tort claims might not have arisen but for the fact that she worked alongside an alleged criminal cannot be determinative.

{¶116} Therefore, I concur with the majority's finding that Arnold's intentional tort claims are outside the scope of the parties' arbitration agreement and therefore not subject to arbitration. However, Arnold's other claims, that relate directly to the employment relationship, must be resolved in arbitration in accordance with the parties' agreement.